982 So.2d 90 (2008)
AMERICAN HOME ASSURANCE COMPANY, Appellant,
v.
Jacques F. JUNGER, etc., Appellee.
No. 3D07-3.
District Court of Appeal of Florida, Third District.
May 7, 2008.
Rehearing Denied June 12, 2008.
*91 Carlton Fields and Robert E. Biasotti, Saint Petersburg, and Cristina Alonso, Miami, for appellant.
Schulte & Bisbing and John H. Schulte, Miami, for appellee.
Before RAMIREZ and SALTER, JJ., and SCHWARTZ, Senior Judge.
SALTER, J.
American Home Assurance ("AHA") appeals a circuit court order awarding Gertrude Junger $302,888 in death benefits and prejudgment interest owed to her following the death of her late husband. We affirm.

Coverage and the Missing Policy
During the Vietnam War, Eastern Air Lines entered into a collective bargaining agreement (the Military Airlift Command or "MAC" Agreement) with The Air Lines Pilots Association. The MAC Agreement offered incentives to Eastern pilots to conduct flights to Vietnam for the United States government, including modifications of the pilots' then-existing death and disability coverage. Under the MAC Agreement, pilots were provided death and disability coverage while they conducted these flights to and from Vietnam. Section 10 of the MAC Agreement provided:
A.2. In the event of death of a pilot resulting from injury or illness incurred while such pilot is or was assigned to the MAC Operation, the Company[[1]] shall pay or cause to be paid, . . . $125,000. . . .
B.2. In the event a pilot is disabled as a result of injury or illness incurred while assigned to the MAC Operation, . . . the Company shall pay or cause to be paid . . . $50,000. . . .
AHA issued an insurance policy, number 9902046, to cover these disability and death benefits. Eastern paid the premiums on the policy until the airline went out *92 of business in 1984. AHA subsequently canceled the policy.
Captain Mathias Frank Junger was a pilot for Eastern who conducted flights for the MAC Operation. Captain Junger was covered under the MAC Agreement. In 1968, while still flying MAC flights, he was diagnosed with coronary artery disease, ceased flying, and filed a disability claim. As provided by the MAC Agreement, he received a lump-sum payment of $50,000 in disability benefits in a check issued by AHA.
Captain Junger passed away in 1991. His cardiologist testified that the Captain's death was caused by, or was a consequence of, the coronary artery disease diagnosed in 1968. AHA denied the claim of Captain Junger's widow, Gertrude for the death benefits described in the MAC Agreement. Mrs. Junger then filed suit against AHA, claiming the benefits outlined in Section 10.A.2 of the agreement.[2]
Although the parties located a copy of the MAC Agreement, neither could locate a copy of the insurance policy identified in correspondence pertaining to Captain Junger's disability claim and AHA's payment of that claim.

Trial
Following a bench trial, the court determined that Mrs. Junger was entitled to the death benefits described in the MAC Agreement. While neither party could produce a copy of the insurance policy, Mrs. Junger introduced the MAC Agreement into evidence as well as the correspondence among her late husband, Eastern Air Lines, and AHA. These documents confirmed that AHA issued a check to Captain Junger for $50,000 in disability benefits under "policy number 9902046" for an illness incurred while he was working for the MAC Operation. Captain Junger's cardiologist tied Captain Junger's later death to that covered illness.
The trial court concluded that the MAC Agreement evidenced the primary terms of coverage  terms confirmed by AHA's payment of the disability claim  and awarded Mrs. Junger the death benefits plus interest. This appeal followed.

Standard of Proof and the Lost Insurance Policy
AHA contends that the proper standard of proof for cases dealing with lost insurance policies is "clear and convincing" evidence, and that Mrs. Junger did not present sufficient evidence of the contents of the policy at issue here. AHA also claims that Mrs. Junger did not prove that coverage continued after the policy was cancelled.
In support of its lost instrument argument, AHA cites a number of Florida cases that hold a clear and convincing standard of proof applies when a party has the burden of proving the contents of a lost instrument. None of these cases, however, deals with a lost insurance policy. See Fries v. Griffin, 35 Fla. 212, 17 So. 66, 68 (1895) (lost deed); Am. Sav. & Loan Ass'n of Fla. v. Atl. Inv. Corp., 436 So.2d 442, 443 (Fla. 4th DCA 1983) (lost lease agreement); Weinsier v. Soffer, 358 So.2d 61 (Fla. 3d DCA 1978) (lost loan agreement); Locke v. Pyle, 349 So.2d 813 (Fla. 1st DCA 1977) (lost deed).[3] AHA submits that no Florida case applies this standard *93 of proof to a lost insurance policy, and we have found none.
We find the lost instruments in the cases cited by AHA warrant a heightened evidentiary standard because deeds, wills, oral contracts and the like are susceptible to fraud. See 9 John Henry Wigmore, Wigmore on Evidence § 2498(3) (James H. Chadbourn rev. 1981). Insurance policies identified by number and known to have been issued by the insurer, on the other hand, are not as vulnerable to fraud as these other instruments. This is so because "[t]he evidence used to establish the existence and contents of [insurance] policies is usually comprised of business records and standard forms made by and found in the possession of the party against whom they are being offered." Remington Arms Co. v. Liberty Mut. Ins. Co., 810 F.Supp. 1420, 1425-26 (D.Del. 1992).
Similarly, the Law Revision Council Note to section 90.803(6), Florida Statutes (1976), provides that the reliability of business records justifies an exception to the hearsay rule.[4] This exception underscores the likelihood that an insurance policy, presumably in the records of the insurer which issued it, is not vulnerable to fraudulent assertions by an insured seeking to prove the policy's contents and coverage.[5] Accordingly, we find that an insured seeking to prove coverage under a lost insurance policy (a policy identifiable and shown to have been issued or acknowledged by the insurer) need only do so by the usual and less-stringent preponderance of the evidence standard.

Coverage after Cancellation
AHA also argues that Mrs. Junger failed to provide evidence that the coverage was still effective after the policy was canceled in 1984. However, once Mrs. Junger established coverage under the MAC Agreement, the burden shifted to AHA to prove a coverage limitation such as a term informing an insured that coverage does not continue indefinitely after a policy's cancellation. See Bell Lumber & Pole Co. v. U.S. Fire Ins. Co., 60 F.3d 437, 445 (8th Cir.1995) (finding that an insurer has the burden of proving coverage limitations). Fairness dictates that an insurer is in the best position to produce this evidence. This is particularly true where, as here, there is a group insurance policy entered into after a collective bargaining agreement is reached, and the insured will often only receive a copy of the agreement and a certificate referencing a master policy  a master policy that remains in the hands of the insurer.
Indeed, there was testimony that Captain Junger would have only received a memorandum outlining the basic terms of coverage in addition to a copy of the MAC Agreement. No copy of such a memorandum was produced by either party, and the trial court could not assume that such a document would have listed a particular coverage limitation term.
*94 Additionally, an insurance underwriter for AIG (AHA's parent company) testified that the notice of cancellation of the policy admitted by AHA contained a number different from the original policy number. The underwriter testified that this different policy number was not a cancellation notice of the original contract. Instead, the notice was a cancellation notice for a continuation of the original policy. However, Captain Junger's check from AHA for the disability payment contained the original policy number, and the accompanying letter from Eastern informed him that the payment was coming under the MAC Agreement. No evidence was produced that the Jungers were ever notified that the coverage had terminated once the policy was cancelled. While this same underwriter testified that "normally" a cancellation notice was sent, AHA offered no other evidence that cancellation notices were sent to Eastern employees or that a provision existed limiting coverage for death to a specific time. The Jungers, on the other hand, introduced the MAC Agreement to reveal the particulars of coverage and the death benefit. Thus, AHA failed to prove that coverage was terminated by the cancellation of the policy in 1984.

Date of Entitlement
Finally, we disagree with AHA's contention that Mrs. Junger's entitlement to the death benefits did not arise until her husband passed away, some seven years after the policy was cancelled for non-payment of premium by Eastern. AHA relies on Alvarez v. Southwestern Life Insurance Co., 86 N.M. 300, 523 P.2d 544 (1974), for this argument.
In Alvarez, an employee was injured while working, and eventually died from his injuries. His group insurance was terminated by his employer after the injury but before the employee died. The insurer paid the employee's disability benefit, but refused to cover the death benefits because the policy had been cancelled. In affirming the denial of benefits, however, the court in Alvarez construed a specific limitations provision in the actual policy. Id. at 547.
In this case, AHA has been unable to prove any such "date of claim" limitation in the policy or in the MAC Agreement describing the policy terms. The available evidence demonstrates that Mrs. Junger was entitled to death benefits for a death resulting from an illness her husband incurred during the time he "is or was" working for the MAC Operation. This term is not ambiguous.

Conclusion
Finding no error in the trial court's findings, each of which is based on competent substantial evidence, we affirm the final judgment below.
Affirmed.
NOTES
[1] "The Company" is defined in the agreement as Eastern.
[2] During the course of these proceedings, Mrs. Junger passed away. By separate order we have granted the motion to substitute the personal representative of her estate as appellee.
[3] In addition, these cases do not uniformly apply the term "clear and convincing"; similar terms, including "clear and satisfactory" or "clear, strong and unequivocal" are also used.
[4] The Council Note states: "The exception is generally recognized because of the reliability of business records supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, and by a duty to make an accurate record as part of a continuing job or occupation."
[5] As regulated entities in a business fraught with claims and litigation by its very nature, insurers have advanced record-keeping systems, industry-standard forms, and procedures that should protect them from fabricated claims under a purported policy never issued. When it has been established that a lost policy was in fact issued and certain benefits were paid under it, as here, the risk of fabrication or fraud are obviously minimized.